# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILD HORSE PRESERVATION CAMPAIGN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KEN SALAZAR, Secretary of the Department of the Interior, *et al.*, <br><br> Defendants. | Civil Action No. 11-02222 (BAH) <br> Judge Beryl A. Howell |

## MEMORANDUM OPINION AND ORDER

This case involves a challenge by nonprofit groups and individual citizens to administrative decisions made by the Interior Department's Bureau of Land Management ("BLM") in 2008 and 2011, which, *inter alia*, authorize the rounding up, castrating, and returning of gelded (or castrated) wild horses to public land in Nevada. *See* Complaint ("Compl."), ECF No. 1, ¶ 1. The Plaintiffs[1] allege that these administrative decisions violate the Wild Free-Roaming Horses and Burros Act ("WHA"), 16 U.S.C. §§ 1331-1340, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706, and BLM's regulations. Compl. ¶¶ 1-2. On March 16, 2012, the Plaintiffs filed a Motion for Summary Judgment. ECF No. 18. In that Motion, the Plaintiffs relied, *inter alia*, on the declarations of four leading wild horse experts: (1) Dr. Anne

---

[1] The Plaintiffs in this case are the American Wild Horse Preservation Campaign ("AWHPC"), which is a "broad-based coalition of public interest groups, environmentalists, humane organizations, and historical societies representing over ten million supporters," Compl. ¶ 4; the Western Watersheds Project ("WWP"), a "nonprofit conservation group . . . that protects and restores western watersheds and wildlife through education, public policy initiatives, and litigation — with a particular focus on public lands management in eight western states including Nevada," *id*. at 8; the Cloud Foundation, a 501(c)(3) nonprofit organization based in Colorado "dedicated to the preservation of wild horses and burros on public lands in the western United States including in the Pancake Complex," *id*. at 12; Craig Downer, a "fourth generation Nevadan" who is a "renowned wildlife ecologist," *id*. at 14; and Arla Ruggles, who is "a photographer with a professional and personal interest in the Pancake Complex wild horse herds, including the Jakes Wash herd." *Id.* at 16.

Perkins (Ex. A), (2) Dr. Bruce Nock (Ex. B), (3) Dr. Jay Kirkpatrick (Ex. C), and (4) Dr. Allen

Rutberg (Ex. D) (collectively, the "Expert Declarations").  *Id*., Ex. A-D.  The Defendants now

seek to strike the portions of the Plaintiffs' Motion for Summary Judgment and supporting

memorandum that rely on the Expert Declarations.  Pending before the Court is the Defendants'

Expedited Motion to Strike Extra-Record Evidence and Memorandum in Support, ECF No. 19

("Motion to Strike"), in which the Defendants seek to bar consideration of the Expert

Declarations on grounds that (1) these declarations are not part of the Administrative Record

("AR"), and (2) the Plaintiffs erred in not seeking leave of the Court to supplement the AR with

the Expert Declarations in accordance with the scheduling order, *see* Minute Order (Dec. 22,

2011) ("The plaintiffs shall file any motion to compel completion or supplementation of the

Administrative Records or for review of extra-record documents by February 28, 2012.").  For

the reasons explained below, the Court denies the Defendants' Motion.  The Court concludes that

the Expert Declarations are part of the AR, so the Court also denies Defendants' request, *see*

Motion to Strike at 2, for "leave to file responsive evidence" and for an adjustment of the

summary judgment briefing schedule.

     I.      BACKGROUND

         A.     OVERVIEW OF PLAINTIFFS' CLAIMS

This case arises from a challenge to BLM's administrative decisions related to the

management of wild horse populations on public lands, and particularly BLM's decision to

round up horses, castrate the males, and then return the gelded (or castrated) horses ("geldings")

to public land.  Although the Plaintiffs' claims relate particularly to BLM's 2008 and 2011

administrative decisions affecting wild horses in an area known as Pancake Complex[2] located in

---

[2] The Pancake Complex is an area of 1,166,099 acres of mostly public lands in central Nevada.  Pls.' Mem. in Supp.
of Mot. for Summ. J., ECF No. 18 ("Pls.' Summ. J. Mem."), at 8.  The Pancake Complex consists of the Pancake

central Nevada, the Plaintiffs argue that BLM's approach in Nevada is a "prototype for BLM

wild horse management across the West . . . ."  Pls.' Mem. in Opp. to Fed. Defs.' Mot. to Strike,

ECF No. 22 ("Pls.' Mem."), at 2.

In 2011, two of the Plaintiffs in this case (AWHPC and WWP) were involved in a related

lawsuit against BLM, challenging BLM's plans for the management of wild horses in the White

Mountain and Little Colorado HMAs in Wyoming.  BLM's plans for those two HMAs in

Wyoming called for the round-up and removal of female horses and the castration of male

horses, which would then be returned to the range.  *See Am. Wild Horse Preservation Campaign

v. Salazar*, 800 F. Supp. 2d 270, 271 (D.D.C. 2011) (Jackson, J.).  The Plaintiffs relied on the

same four Expert Declarations that are the subject of the pending Motion.  *Id*. at 273 (noting that

"all of the Declarations attached to plaintiffs' motion for preliminary injunction addressed the

environmental, behavioral, genetic, physiological, aesthetic, social, and/or ecological effects of

the particular population management approach embodied in the modified decision: castration.").

Before a decision on the merits of Plaintiffs' challenges was released, however, BLM abandoned

its rounding up and gelding plan while the lawsuit was pending.  Despite the Plaintiffs' requests

to proceed with the lawsuit because BLM had other proposed actions pending that included a

gelding program, *see id*., the Plaintiffs' claims were dismissed as moot.  *Id*. at 271.  Following

dismissal of that case, the Plaintiffs claim that BLM has considered using the gelding approach

in other areas in both Wyoming and Nevada, including the Tri-State-Calico Complex in Nevada,

the Great Divide Basin HMA in Wyoming, and the Red Desert Complex in Wyoming, but in the

face of opposition has withdrawn this method in each of these locations.  Pls.' Mem. at 5; *see

also* Declaration of Suzanne Roy, ECF No. 22, Ex. A (dated Apr. 9, 2012) ("Roy Decl.") ¶ 7.

---

Herd Management Area ("HMA") (855,000 acres), the Sand Springs West HMA (157,436 acres), and the Jakes
Wash HMA (153,663 acres).  *Id*.; *see also* BLM Pancake Complex Decision, AR 21-22 (the AR was manually filed
with the Court, rather than filed on ECF, due to the large volume of the AR).

Notably, in each of the prior Wyoming and Nevada proceedings in which the gelding approach was considered by BLM, AWHPC submitted statements by the same experts whose declarations are at issue here.  Roy Decl. ¶¶ 6-7; Pls.' Mem at 5.  As AWHPC points out, "all of these declarations had been submitted to the [BLM] on several occasions long before BLM issued the decision that is challenged in this case, and specifically with reference to the agency's failure to consider the environmental impacts of its proposed strategy of returning gelded male horses to the range."  Roy Decl. ¶ 1.

On November 28, 2011, BLM again announced plans to "pilot" a gelding program. BLM's Egan Field Office in Ely, Nevada released the Pancake Complex Final Decision ("Pancake Complex Decision") announcing that the BLM Egan and Tonopah Field Offices in Nevada had determined that there were "excess wild horses . . . present within and outside the boundaries" of the Pancake Complex, and proposing a "pilot" program involving the gelding approach to manage the horse population.  *See* Decision Record, AR 11.  BLM explained that the proposed action "is a pilot management alternative that calls for a phased-in approach [involving] gradually removing excess animals, implementing fertility control, adjusting sex ratios, and managing a portion of the herd as a non-breeding population of geldings."  *Id.*

On December 14, 2011, following BLM's announcement about the Pancake Complex Decision, the Plaintiffs filed a Complaint challenging two decisions of BLM: (1) the 2008 Ely Resource Management Plan ("RMP"), and its accompanying Final Environmental Impact Statement ("FEIS"), in which the Plaintiffs claim that BLM authorized the removal of all wild horses in the "Jakes Wash" area of Nevada and a substantial reduction in the wild horse population in the Pancake Complex, and (2) BLM's November 28, 2011 Pancake Complex Decision, in which BLM sought to implement the Ely RMP with, *inter alia*, a "pilot"

management program of castrating wild horses and returning these "geldings" to the range, without considering the various environmental impacts of this approach, and without preparing an Environmental Impact Statement ("EIS").  *See* Compl.; Pls.' Summ. J. Mem. at 1.

In their Complaint, Plaintiffs allege that BLM has (1) "violated its obligations under the WHA to 'protect and manage' these 'wild and free-roaming' horses as 'living symbols of the historic and pioneer spirit of the West' and to ensure that 'all management activities shall be at the minimal feasible level,'" Compl. ¶ 1 (quoting 16 U.S.C. §§ 1331, 1333(a)); (2) "violated its obligations under the [NEPA] by failing to adequately analyze the environmental consequences of its decision on the individual wild horses or the herds as a whole; failing to consider reasonable alternatives such as reducing the amount of livestock permitted on these lands; and failing to prepare an [EIS]," *id*. ¶ 1; (3) "violate[d] its own resource management plan for this area of public lands which requires it to 'protect' and 'maintain' viable, 'self-sustaining' herds of 'wild' horses while retaining their 'free-roaming' nature . . . ," *id*. ¶ 2, and (4) "violated its obligations under the [APA] by failing to consider the impacts of its actions on both the individual horses and wild populations as a whole; failing to explain the basis for its management choices; and failing to respond to significant comments in opposition to these management actions, including sworn declarations from biologists and others concerning the significant adverse [e]ffects such actions will have on these wild horses," *id*.  The Plaintiffs ask that the Court enjoin the Defendants "from taking any further actions to roundup and remove any wild horses from the Pancake Complex, including Jakes Wash, until they have fully complied with the provisions of [the WHA, NEPA, and the APA]."  *Id*. at 34.

The Plaintiffs have moved for Summary Judgment on their claims, relying in part on the Expert Declarations, which raise concerns about the management of wild horse populations

using the method of gelding male horses.  *See* ECF No. 18, Exs. A-D.

                B.       MOTION TO STRIKE

Before responding to the Plaintiffs' Motion for Summary Judgment, the Defendants

moved to strike the Expert Declarations and any reference to them in the Plaintiffs' Motion for

Summary Judgment.  ECF No. 19.  The Defendants claim that these Expert Declarations are not

part of the AR because the comments submitted by the Plaintiffs in 2011 during the 30-day

public comment period on the Preliminary Environmental Assessment ("PEA") for the Pancake

Complex Decision did not include the four Expert Declarations.  A brief overview of the

circumstances surrounding this comment period, and leading up to the Plaintiffs' filing of their

Motion for Summary Judgment, is helpful to understanding the Defendants' pending Motion,

and why this Court must deny the Motion.

On September 28, 2011, less than one month after the August 8, 2011 dismissal of the

lawsuit against BLM over its proposed gelding plan for two HMAs in Wyoming, BLM through

its Egan Field Office announced its plans to include a gelding component in a horse roundup in

the Pancake Complex.  *See* AR 151.  The Pancake Complex proposal called for the gathering of

approximately 65 to 70% of the wild horses every two to three years with the goal of removing

approximately 800 to 1,000 excess horses per gather for a period of six to ten years.  *See* AR

162.  The proposal said that "[a]pproximately 200 stallions would be gelded (castrated) and

released back into the HMA's representing a non-reproductive component in the HMA."  *Id*. at

163.  According to BLM's proposal, the "targeted number of geldings would also be phased-in

over two to three gather cycles in order to observe how the geldings are transitioning into the

overall population as well as utilizing their habitat."  *Id*.  BLM's Egan Field Office announced a

30-day comment period for the PEA for the Pancake Complex Decision, with all public

comments to be received no later than October 28, 2011.  *See* Motion to Strike at 2; AR 151.

AWHPC responded to the proposal on October 28, 2011 by submitting via facsimile transmission to the Egan Field Office detailed comments opposing the proposed decision.  AR 646-64.  The comments emphasized that BLM included in its proposal only "anecdotal" information about the expected impact of gelding on stallions, and referenced no scientific studies or data.  *Id.* at 652.  The comments also noted that the PEA "fails entirely to consider the impacts of sterilization on stallions . . . as well as their behavior and therefore impact on the herd."  *Id.*

Of most relevance to the instant Motion, AWHPC's comments relied heavily on the Expert Declarations.  The comments stated that "the impacts of sterilization on wild horses can be severe, affecting both their physiology and ability to survive, as well as their behavior and therefore impact on the herd" and requested that BLM "[p]lease see expert declarations from Drs. Allen Rutberg, Dr. Anne Perkins, Dr. Jay Kirkpatrick and Dr. Bruce Nock for details (Attachments 3-6)."  *Id.*  The comments also provided lengthy excerpts of the Expert Declarations.  *See id.* at 652-53.  The comments, for example, quoted Dr. Kirkpatrick, the Director of Science and Conservation Biology at Zoo Montana and a "foremost authority on wildlife reproductive biology" as stating that "[c]astrating horses will effectively remove the biological and physiological controls that prompt these stallions to behave like wild horses.  This will negatively impact the place of the horse in the social order of the band and the herd."  *Id.*  The comments also quote Dr. Nock, a faculty member at Washington University School of Medicine, as stating, *inter alia*, that "[g]elding (removing a horse's testes) will have irreversible effects on both the individual horse and the herd . . . In my professional opinion, releasing a castrated horse into a wild herd is an inhumane management approach that certainly does not

'protect' or 'help preserve' wild horses in any sense of the word." *Id*. at 653. AWHPC's comments, relying on the Expert Declarations, are indisputably part of the AR. *See* AR 646-64.

The parties dispute, however, whether the Expert Declarations relied on in AWHPC's comments are part of the AR because they were not received before the end of the comment period. Although the comments included a list of "Attachments" that referenced the four Expert Declarations, *see* AR 664, AWHPC concedes that the Expert Declarations were not attached to the comments faxed to BLM before the comment period deadline. These declarations were only referenced and quoted in the text of the comments as well as cited in the list of references at the end of the comments. *See* Declaration of Deniz Bolbol, ECF No. 22, Ex. D (dated Apr. 6, 2012) ("Bolbol Decl.") ¶ 7. AWHPC points out that the Expert Declarations were, instead, sent in an email within two hours after the deadline for the comments period. The comments in the AR suggest that the attachments would be emailed separately; at the top of the comments, it is noted "Via Email (with attachments): PancakeComplex@blm.gov" and "Via Fax (without attachments): 775-289-1910." AR 646. It is unclear from the record, however, whether BLM ever received the Expert Declarations by email. While AWHPC assumed that the Expert Declarations had been received and would be considered in the agency's decision-making process, *see* Bolbol Decl. ¶ 14, BLM argues that it never received the Expert Declarations by email and the Expert Declarations were not considered. Fed. Defs.' Reply in Supp. of Defs.' Mot. to Strike, ECF No. 23 ("Defs.' Reply"), at 3 n.1 (citing Declaration of Ruth A. Thompson, ECF No. 19, Ex. C (dated Mar. 30, 2012) ("Thompson Decl.") ¶ 15).

The Communications Director for AWHPC, Deniz Bolbol, states that, after the comments were submitted by facsimile to BLM, she sent three emails to BLM between 1:49 A.M. and 1:57 A.M. on October 29, 2011. Bolbol Decl. ¶ 7. The first email was a "courtesy copy" of the

comments that were earlier faxed to BLM on October 28, 2011.   The second email contained six

of the twelve attachments referenced in AWHPC's comments (including all four of the Expert

Declarations), and the third email contained the remaining six attachments.  *Id*.  On Sunday,

October 30, 2011, Bolbol received an "error message" from her email provider "indicating that

BLM's email server did not accept" one of the three email messages, namely the second email

message containing the four Expert Declarations.  *Id*. at ¶ 9.  On October 31, 2011, the first

business day following the end of the comment period, Bolbol called and left a voicemail

message for a BLM Ely Field Office employee (Ruth Thompson) explaining the situation and

requesting a call back.  *Id*.  Bolbol then emailed two employees of BLM's Ely Field Office (Ruth

Thompson and Rosemary Thomas) explaining the email error message and requesting

confirmation that the email attachments had been received.  *Id*.  On Tuesday, November 1, 2011,

Bolbol again emailed the same two employees of BLM's Ely Field Office and informed them

that, since she had not yet heard back from them, she would re-send the emails to ensure that

BLM had them.  *Id*. at ¶ 10.  Bolbol then resent the emails, along with all of the attachments.

This time she sent the emails with fewer attachments, and did not receive any error messages,

"leading [her] to believe that the messages had been properly received by BLM."  *Id*.[3]

On November 3, 2011, Bolbol received an email from Ruth Thompson, replying to

Bolbol's email of October 31, 2011, noting that the Ely District BLM received two emails from

Bolbol.  Email from Ruth Thompson to Deniz Bolbol, ECF No. 19, Ex. A (dated Nov. 3, 2011,

10:11 A.M.).  Thompson noted that the second email "was not received possibly due to the

attachments being too large.  The total message size including attachments must not exceed 4

megabytes.  If there were any attachments please send fewer attachments per message or use a

---

[3] Apparently, BLM contends that it did not receive the Expert Declarations as email attachments with the November 1, 2011 emails.  Thompson Decl. ¶¶ 11, 15.

compression utility to reduce the attachment size." *Id*. Thompson emphasized, however, that "[r]egardless of whether or not BLM received all of these messages, the fact is these messages were sent after the comment period closed. Therefore we are unable to include these comments into the EA." *Id*. Bolbol replied arguing that "[t]he attachments are supportive of the letter itself and it [is] unreasonable that the BLM is not willing to accept attachments to public comments sent within the public comment period." Email from Deniz Bolbol to Ruth Thompson, ECF No. 19, Ex. A (dated Nov. 3, 2011, 11:08 A.M.). Thompson replied by email again, noting that the Ely District BLM did receive the comments by fax on October 28, 2011 but noting that no "documentation" was received until after the public comment period had closed. Email from Ruth Thompson to Deniz Bolbol, ECF No. 19, Ex. A (dated Nov. 3, 2011, 1:36 P.M.)

On November 4, 2011, Bolbol emailed Thompson, stating that "we wanted to make sure that the documents referenced in our comments are properly considered as part of the administrative record for the PEA." Email from Deniz Bolbol to Ruth Thompson, ECF No. 19, Ex. A (dated Nov. 4, 2011, 11:14 A.M.). The email listed the 12 attachments that were referenced in AWHPC's comments, including the Expert Declarations:

> 3. Declaration of Dr. Anne Perkins – In the possession of the BLM pursuant to Civil Action No. 11-1352 (ABJ), American Wild Horse Preservation Campaign, et al. v. Ken Salazar, Secretary, Department of Interior, et. al.
> 4. Declaration of Dr. Allen Rutberg – In the possession of the BLM pursuant to Civil Action No. 11-1352 (ABJ).
> 5. Declaration of Dr. Jay Kirkpatrick – In the possession of the BLM pursuant to Civil Action No. 11-1352 (ABJ).
> 6. Declaration of Dr. Bruce Nock – In the possession of the BLM pursuant to Civil Action No. 11-1352 (ABJ).

Email from Deniz Bolbol to Ruth Thompson, ECF No. 19, Ex. A (dated Nov. 4, 2011, 11:14 A.M.). The email further stated that "[a]lthough [the BLM] is already in possession of 11 out of 12 of the referenced documents, we wanted to provide you with another copy of these records

via email.  Similarly, as a courtesy, we emailed the BLM an electronic copy of the comments,

which you acknowledge receiving on October 28, 2011.  The emailed version of the faxed

comments was received by your office one hour and 47 minutes after the comment deadline (i.e.

at 1:47 a.m. on Saturday, October 29, 2011).  Again, since the referenced attachments in

AWHPC's comments on the Pancake Complex PEA are already in the possession of the BLM,

we fully expect that these records will be considered as part of the administrative record for this

EA."  *Id.*

On February 14, 2012, BLM lodged a 10,972-page administrative record, which it

provided to Plaintiffs' counsel the next day.  Pls.' Mem. at 10 (citing Declaration of William S.

Eubanks II, ECF No. 22, Ex. E (dated Apr. 9, 2012) ("Eubanks Decl.") ¶ 2).  The Plaintiffs state

that Plaintiffs' counsel confirmed that AWHPC's comments were in the AR and then, "assuming

that such comments necessarily included the supporting attachments, . . . devoted his scant

remaining time to sifting through the balance of the record . . . ."  Pls.' Mem. at 10.  The

Plaintiffs explain that it only came to the attention of Plaintiffs' counsel on February 29, 2012,

the day after motions for supplementation of the administrative record were due pursuant to this

Court's scheduling order, that the attachments to AWHPC's comments (including the Expert

Declarations), were not included in the AR.  *Id.* (citing Eubanks Decl. ¶ 4).

After realizing that the attachments were not included in the AR, Plaintiffs' counsel

"immediately contacted BLM's counsel . . . request[ing] that the attachments be included with

the supplemental Administrative Record filing that BLM had already agreed to file."  Pls.' Mem.

at 10.  According to the Plaintiffs, BLM's counsel responded, however, that "[b]ecause the

additional documents were submitted after the comment period had closed, BLM did not

consider the documents in making the decisions challenged in this litigation, and therefore they

11

are not part of the administrative record." *Id*. at 10-11 (citation omitted).[4]  Plaintiffs' counsel

informed Defendants' counsel that the Plaintiffs still planned to rely on the Expert Declarations

in their Motion for Summary Judgment "because of Plaintiffs' view that these attachments

should have been part of the record because they were in BLM's possession at the time it made

its decision, and that, in any case, under D.C. Circuit case law . . ., the Court can consider the

documents because they are extra-record evidence of BLM's failure to consider relevant factors

required by NEPA and the APA." *Id*. at 11.  According to the Plaintiffs, Defendants' counsel

responded, "I understand your position and that you need to do what you feel you must do." *Id*.

(quoting Eubanks Decl. ¶ 6).

Without seeking leave of the Court to supplement the AR with the Expert Declarations,

on March 16, 2012, the Plaintiffs filed their Motion for Summary Judgment, relying on the

Expert Declarations.  ECF No. 18.  In support of their Motion, Plaintiffs stated that "[a]lthough

BLM takes the position that these expert declarations should not be considered by the Court in

this case, BLM clearly had all of these declarations in its possession when it decided to use

gelding in the Pancake Complex on November 28, 2011, and hence these materials were clearly

before the agency when it made this decision, and therefore must be considered part of the

Administrative Record." *Id.* at 15-16 n.6.  The Plaintiffs note that "if necessary, Plaintiffs can

formally move the Court to require BLM to include them in the record." *Id*.

## II.    STANDARD OF REVIEW

Under the APA, "the focal point for judicial review should be the administrative record

already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*,

---

[4] The Defendants clarify that while Defendants' counsel initially told the Plaintiffs that the Expert Declarations were not included in the administrative record because they were received after the comment period, the Expert Declarations that the Plaintiffs intended to attach to their comments were actually never received by BLM. *See* Defs.' Reply at 3 n.1 (citing Thompson Decl. at ¶ 15).

411 U.S. 138, 142 (1973).  An agency's designation of the record "is entitled to a strong

presumption of regularity."  *Pac. Shores Subdiv. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d

1, 6 (D.D.C. 2006) (citation omitted).  At the same time, "[i]f a court is to review an agency's

action fairly, it should have before it neither more nor less information than did the agency when

it made its decision" because "[t]o review less than the full administrative record might allow a

party to withhold evidence unfavorable to its case . . . ."  *Walter O. Boswell Memorial Hospital

v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).  An agency "may not skew the record in its favor

by excluding pertinent but unfavorable information, [n]or may the agency exclude information

on the grounds that it did not 'rely' on the excluded information in its final decision."  *Fund for

Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005) (citations omitted).  Instead, the

"record must include all documents that the agency directly or indirectly considered."  *Id*. at 196

(citations and quotation marks omitted).  The "whole record include[s] all materials that might

have influenced the agency's decision, and not merely those on which the agency relied in its

final decision."  *County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 71 (D.D.C. 2008)

(citation and quotation marks omitted).

   "To overcome the strong presumption of regularity to which an agency is entitled, a

plaintiff must put forth concrete evidence that the documents it seeks to 'add' to the record were

actually before the decisionmakers."  *Franks v. Salazar*, 751 F. Supp. 2d 62, 67 (D.D.C. 2010)

(citation omitted).  "A plaintiff cannot merely assert, however, that materials were relevant or

were before an agency when it made its decision . . . Instead, the plaintiff must identify

reasonable, non-speculative grounds for its belief that the documents were considered by the

agency and not included in the record."  *Id*. (citations, quotation marks, and emphasis omitted).

   The D.C. Circuit has explained that courts "do not allow parties to supplement the record

unless they can demonstrate unusual circumstances justifying a departure from this general rule."

*City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010).  The record may be

supplemented in three circumstances: "(1) if the agency deliberately or negligently excluded

documents that may have been adverse to its decision, (2) if background information was needed

to determine whether the agency considered all the relevant factors, or (3) if the agency failed to

explain administrative action so as to frustrate judicial review . . . ."  *Id.* (citation and quotation

marks omitted); *see also County of San Miguel*, 587 F. Supp. 2d at 72 (explaining that "a party

seeking to supplement the record must establish that the additional information was known to the

agency when it made its decision, the information directly relates to the decision, and it contains

information adverse to the agency's decision").

 III. DISCUSSION

  On March 30, 2012, the Defendants filed the instant Motion, moving to strike the Expert

Declarations appended as exhibits to the Plaintiffs' Motion for Summary Judgment and the parts

of Plaintiffs' memorandum in support of their Motion for Summary Judgment that rely on these

declarations.[5]  The Defendants posit three grounds for exclusion of the Expert Declarations,

arguing that (1) the Declarations are not part of the certified AR because BLM did not receive or

consider them in its decision process and the contents of the AR are "entitled to a strong

presumption of regularity," Motion to Strike at 4 (quoting *Pac. Shores Subdiv.*, 448 F. Supp. 2d

at 6 (citation omitted)); (2) the Plaintiffs' citation to the Expert Declarations in their comments

does not mean that the Declarations themselves are part of the AR; and (3) supplementation of

the AR is inappropriate because the Plaintiffs never moved the Court, in accordance with the

scheduling order, to supplement the AR.  These arguments are not persuasive.

---

[5] At the request of the Defendants, with the consent of the Plaintiffs, the Court stayed summary judgment briefing deadlines pending a decision on this Motion.  *See* Minute Order (Apr. 3, 2012).

The Court will deny the Motion to Strike because the Plaintiffs have shown that AWHPC's timely-filed comments opposing the Pancake Complex Decision clearly cite, and rely extensively on, the Expert Declarations that were already known to BLM, were directly related to and adverse to the agency's decision, and should have been considered part of the AR. *See County of San Miguel*, 587 F. Supp. 2d at 72 (explaining that "a party seeking to supplement the record must establish that the additional information was known to the agency when it made its decision, the information directly relates to the decision, and it contains information adverse to the agency's decision"). First, BLM was in possession of the Expert Declarations when it made the Pancake Complex Decision shortly after the dismissal as moot of related litigation, in which the Expert Declarations were filed, in the District Court of the District of Columbia. *See Am. Wild Horse Preservation Campaign v. Salazar*, 800 F. Supp. 2d 270, 273 (D.D.C. 2011) (Jackson, J.). Not only was BLM in possession of the Expert Declarations from the dismissed lawsuit relating to an HMA in Wyoming, but BLM also possessed the scientific evidence regarding BLM's gelding approach to wild horse management presented by these same Declarants in connection with BLM's proposed administrative actions in three other HMAs in both Wyoming and Nevada. Roy Decl. ¶¶ 1, 6-7. One part of an agency – here, the Egan Field Office – may not simply remain studiously ignorant of material scientific evidence well known to the agency and brought directly to its attention in timely-filed comments. Second, AWHPC's timely-filed comments opposing the Pancake Complex Decision cite to, quote from, and rely extensively on the Expert Declarations of which BLM was already aware. *See* AR 652 ("Please see expert declarations from Drs. Allen Rutberg, Dr. Anne Perkins, Dr. Jay Kirkpatrick and Dr. Bruce Nock for details (Attachments 3-6)"). Thus, the scientific evidence contained in these Expert Declarations should have been considered by BLM and supplementation of the AR with

these Expert Declarations should not, therefore, impose any burden on the agency.  The Court is

persuaded that this is an exceptional circumstance where supplementation of the Administrative

Record is appropriate.[6]

First, the Defendants' argument that the Expert Declarations are not part of the certified

AR because BLM did not receive or consider them in its decision process is unavailing.  While

the contents of the AR are indeed "entitled to a strong presumption of regularity," *Pac. Shores*

*Subdiv.*, 448 F. Supp. 2d at 6, the Plaintiffs in this case have rebutted the presumption of record

regularity where it is evident that the agency was aware of and in possession of the four specific

Expert Declarations on which the Plaintiffs relied extensively in their comments.  *See County of*

*San Miguel*, 587 F. Supp. 2d at 71 (explaining that the "whole record include[s] all materials that

---

[6] Even if these Expert Declarations were not part of the AR, the Court would likely consider them as extra-record evidence.  Extra-record evidence "consists of evidence outside of or in addition to the administrative record that was not necessarily considered by the agency."  *Nat'l Mining Ass'n v. Jackson*, Nos. 10-1220, 11-295, 11-0446, 11-0447, 2012 U.S. Dist. LEXIS 56595, *16 (D.D.C. Apr. 20, 2012) (citation omitted).  In *Esch v. Yeutter*, the D.C. Circuit stated that extra-record evidence could be considered in the following eight circumstances: "(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage."  *Esch v. Yeutter*, 876 F. 2d 976, 991 (D.C. Cir. 1989).  Following *Esch*, the D.C. Circuit "appears to have narrowed these exceptions to four: (1) when the agency failed to examine all relevant factors; (2) when the agency failed to explain adequately its grounds for its decision; (3) when the agency acted in bad faith; or (4) when the agency engaged in improper behavior."  *Nat'l Mining Ass'n*, 2012 U.S. Dist. LEXIS 56595, at *17; *see also Cape Hatteras Access Pres. Alliance v. United States DOI*, 667 F. Supp. 2d 111, 115 (D.D.C. 2009) (noting that the *Esch* exceptions are narrower than some courts have found).  Here, under the exceptional circumstances of this case where BLM had before it Expert Declarations raising specific scientific concerns about the gelding approach and the Defendants state that they made a final decision without considering the Expert Declarations, the Court would consider the Expert Declarations as extra-record evidence in determining whether the agency examined all relevant factors.  *See Nat'l Mining Ass'n*, 2012 U.S. Dist. LEXIS 56595, at *19 (noting that "extra-record evidence will only be considered if it is needed to assist a court's review"); *Cape Hatteras Access Pres. Alliance*, 667 F. Supp. 2d at 115 (explaining that the *Esch* exceptions "are generally more appropriately applied in actions contesting the procedural validity of agency decisions, but even if they are not so limited, it is clear that they were to be sparingly applied to only those cases where extra-record evidence was necessary to make judicial review effective"); *Pac. Shores Subdiv.*, 448 F. Supp. 2d at 6 ("Consideration of extra-record information is appropriate when simply reviewing the administrative record is not enough to resolve the case.").

might have influenced the agency's decision, and not merely those on which the agency relied in

its final decision") (citation and quotation marks omitted).  Even if the "pilot" approach in

Nevada was a site-specific decision by the Egan and Tonopah Field Offices, in consultation with

the Nevada State Director of BLM, *see* Declaration of Alan Shepherd, ECF No. 23, Ex. A (dated

Apr. 16, 2012) ("Shepherd Decl.") ¶¶ 11-12, these offices must have been aware of the very

recent litigation in federal court related to BLM's gelding approach.  Furthermore, as the

Plaintiffs point out, AWHPC had earlier submitted comments on July 18, 2011 and reports by

the same experts in opposing efforts by another Nevada Field Office to include a gelding

component at the Tri-State Calico Complex in Nevada.  *See* Pls.' Surreply in Opp. to Fed. Defs.'

Motion to Strike ("Pls.' Surreply") at 5.  It thus seems highly unlikely that the Nevada State

Director of BLM, who requested that gelding be included in gather plans in Nevada, was not

aware of the Expert Declarations that offered a strong critique of the practice of gelding.[7]  *See*

Shepherd Decl. ¶ 11.  Even if the Nevada decision-makers were not aware of the Expert

Declarations before the lapse of the comment period on the Pancake Complex Decision,

however, the Plaintiffs specifically brought the Expert Declarations to their attention and asked

the agency to consider them in their timely-filed comments.  While an agency decisionmaker "is

not obligated to include every potentially relevant document existing within its agency," in an

AR, *Pac. Shores Subdiv.*, 448 F. Supp. 2d at 6, "those documents that were directly or indirectly

considered by the [agency's] decisionmaker(s) should be included in the administrative record."

*Id; see also Ctr. for Biological Diversity v. United States BLM*, No. C-06-4884-SI, 2007 U.S.

Dist. LEXIS 81114, at *12 (N.D. Cal. Oct. 18, 2007) (allowing supplementation of the

---

[7] This Court does not hold that every field office of BLM is responsible for being cognizant of federal litigation
involving subject areas under their supervision, but where declarations are pointed out to a field office by a party in
their timely-filed comments about a proposed program, and are directly related to the specific program under
consideration (in this case, gelding), it would seem irresponsible for the field office not to take note of earlier highly
relevant federal litigation.

administrative record with evidence that was before the agency and considered directly or indirectly).  Where the Defendants admit that the parts of the Expert Declarations relied on by the Plaintiffs in their comment letter are part of the AR, *see* Defs.' Reply at 7 n.2, where the Plaintiffs referred BLM to the Expert Declarations in their timely-filed comments, where the Expert Declarations as a whole were before BLM in very recent prior litigation, and where the Expert Declarations were related and adverse to the Pancake Complex Decision, the Court concludes that the Expert Declarations should be included in the administrative record.  *See, e.g.*, *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002) (allowing supplementation of the administrative record with transcript from proceedings held after the end of the comment period where the transcript was "directly related to the issue decided in the final rule," and "was adverse to the agency's position," and where the agency cosponsored the proceedings).

Second, the Defendants' argument that the Plaintiffs' citation to the Expert Declarations in their comments does not make them part of the AR is, in this case, unavailing.  The Defendants cite to *In re Delta Smelt Consol. Cases*, No. 09-cv-1053, 2010 WL 2520946, at *3-4 (E.D. Cal. June 21, 2010), for the proposition that mandating agencies to "track down documents referenced in, but not attached to, a comment letter" would be an "unworkable rule."  Defs.' Reply at 6-7.  The Court agrees with the Defendants and the *In re Delta* court that a general rule that "would permit a party to force into the record any number of references, regardless of relevance, simply by attaching to a comment letter a list of references on a particular subject" would indeed be an "unworkable rule."  2010 WL 2520946 at *4.  The Plaintiffs here seek no such rule, however; instead, the Plaintiffs argue that the specific Expert Declarations on which they relied extensively in their timely-submitted comments, and which they requested that BLM

examine, and which were already before BLM in related litigation, and the substance of which was before BLM in other administrative proceedings, are properly part of the AR.  The Court agrees.  This case is distinguishable from *Marcum v. Salazar*, 751 F. Supp. 2d 74, 80 (D.D.C. 2010), where the Court denied plaintiffs' Motion to supplement the record with court filings and materials related to an earlier case before the same court.  In *Marcum*, the Court found that "neither the materials' purported relevance nor plaintiffs' references to [the earlier litigation] during the permitting process constitute concrete evidence that the [agency] considered the materials, either directly or indirectly."  *Id.*  To the contrary, in this case, the Plaintiffs have shown that they specifically directed the agency to the Expert Declarations in their timely-filed comments and later, less than two hours after the comment period ended, attempted to submit the Expert Declarations to the agency.  These efforts, and AWHPC's persistent attempts to ensure that the Expert Declarations were part of the AR, as described *supra* 8-11, constitute evidence that BLM considered the materials at least indirectly.

This case is more analogous to *Styrene Info. & Research Ctr., Inc. v. Sebelius*, No. 11-1079, 2012 U.S. Dist. LEXIS 44214 (D.D.C. Mar. 30, 2012) (Walton, J.), where the plaintiffs sought to supplement the administrative record with reports that were prepared by subgroups of an Expert Panel.  While the defendants there argued that the Department of Health and Human Services' National Toxicology Program never considered the subgroup reports, because they were not included in the Expert Panel's final report, the Court disagreed, finding that the subgroup reports were "an integral part of the Expert Panel's peer review process and influenced the Expert Panel's recommendation," even though they were not "ultimately passed on to the final decisionmaker."  *Id.* at *14-15.  The Court found that the plaintiffs rebutted the "presumption of regularity" of the AR because, *inter alia*, the administrative record included

several references to the subgroup reports.  "These references," the Court noted, "suggest that the Expert Panel substantively considered scientific information and advice contained in the subgroup reports, and was aware of the Expert Panel's reliance on this information and advice." *Id*. at *16.  The Court concluded that the AR should be supplemented "with the missing subgroup reports" based upon the agency's consideration of the subgroup reports "at least indirectly;" the "pertinent scientific information" in the reports, which would "assist the Court in conducting its arbitrary and capricious review under the APA;" and the fact that supplementing the AR would not "be overly burdensome for the agency, as it already possesses the reports."  *Id*. at *17.  Here, too, the extensive reliance on the Expert Declarations in the Plaintiffs' comments, which are part of the AR, suggest that the scientific information included in the Expert Declarations was before the decision-makers and considered.  The Court finds no reason to exclude the complete Expert Declarations from the AR merely because of a technical problem in forwarding copies of the Expert Declarations to the Defendants in a timely manner.

Indeed, to the extent that BLM argues that it was incumbent on the Plaintiffs to provide copies of the Expert Declarations on which the Plaintiffs relied heavily in their comments, the Court disagrees.  BLM was on notice, and in possession, of the Expert Declarations.[8]  While it would have been a courtesy for the Plaintiffs to include a copy of the Expert Declarations already possessed by BLM along with their comments relying on these Expert Declarations, they were not required to do so.  Had the Plaintiffs' comments opposing the Pancake Complex Decision been untimely, then BLM would have been justified in refusing to consider the comments and the Expert Declarations on which they relied.  *See, e.g*., *Appalachian Power Co. v. EPA*, 249

---

[8] Even if the Defendants were unaware of where they could retrieve these Expert Declarations when they were cited in AWHPC's timely-filed comments, AWHPC provided the Defendants the docket number for the case in which these Declarations were filed on November 4, 2011, so the docket citations were available three weeks before the Defendants released their final Pancake Complex Decision on November 28, 2011.

F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments that are not timely filed.") (citing *Personal Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 543 (D.C. Cir. 1995) ("Agencies are free to ignore such late filings")). The comments and the "issues and evidence in [the] comments" were, however, timely filed.  As such, they should have been considered as part of the AR.  *See, e.g.*, *Envt'l Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1029 (E.D. Cal. 2000) (supplementing an administrative record with attachments to a comment letter where "plaintiffs provided defendants during the public comment period . . . several letters which laid out the specifics of their contention" and the "attachments [that were never received by the federal defendants because of a mistake of the non-federal defendant] supplemented their efforts by offering full, but not new, evidence of the [programs'] shortcomings"); *see also Ad Hoc Metals Coalition*, 227 F. Supp. 2d at 140 (rejecting argument that "late-filed comments always can be ignored for purposes of the administrative record" and noting that "[w]hile the comment period must end at some point, where highly relevant information comes to light one month later because of an agency's own initiative, prior to promulgation of a final rule and with a sufficient amount of time remaining that the ultimate decision can be influenced . . . such information should be included in the record.").

Third, the Defendants' argument that supplementation of the AR is inappropriate because the Plaintiffs never moved the Court, in accordance with the scheduling order, to supplement the AR is also unavailing.  The Defendants argue that "Plaintiffs had ample notice of BLM's position that the attachments were not in the AR and an opportunity to move to compel record supplementation within the Court's schedule" but the Plaintiffs did not move for record supplementation.  Motion to Strike at 9.  "Plaintiffs' disregard for both the schedule and proper

procedures for supplementing an AR," the Defendants argue, "should not be rewarded." *Id.*
While the Court takes seriously its scheduling order, given the volume of the AR, and Plaintiffs'
assumption that the Expert Declarations were incorporated in the AR, the Court will excuse the
Plaintiffs from not earlier seeking leave to supplement the AR.  Accordingly, the Court finds that
the Expert Declarations are part of the AR and will consider them in its decision on the
Plaintiffs' Motion for Summary Judgment.

Finally, the Court turns to the Defendants' request for "leave to file responsive evidence
in support of their cross-motion for summary judgment as well as an appropriate adjustment of
the summary judgment briefing schedule" should the Court allow consideration of the Expert
Declarations.  Motion to Strike at 2.  Specifically, the Defendants seek to "explain why the
[Expert Declarations] (i) address the particularities of the gather plan in Wyoming rather than the
Pancake Complex and therefore are inapposite, and (ii) present views considered by the BLM
decisionmakers who chose, based on the evidence available at the time, to take a course different
than Plaintiffs' preferred alternative."  Defs.' Reply at 2.  Plaintiffs have noted that they
"vigorously oppose this request."  Pls.' Mem. at 21.  The Court denies the request.  If the
Defendants would like to consider and respond to the Expert Declarations as part of the AR,
BLM should seek a remand of its Pancake Complex Decision for reconsideration in light of the
Expert Declarations.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the
record before the agency does not support the agency action, if the agency has not considered all
relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on
the basis of the record before it, the proper course, except in rare circumstances, is to remand to
the agency for additional investigation or explanation").  The Defendants have provided no
compelling reason for the Court to allow them additional time to supplement the evidence in

light of the Expert Declarations that were part of the AR at the time the Pancake Complex

Decision was made.

Accordingly, it is hereby

**ORDERED** that the Defendants' Expedited Motion to Strike Extra-Record Evidence,

ECF No. 19, is DENIED; it is further

**ORDERED** that the Defendants' request to file evidence responsive to the Expert

Declarations in support of their cross-motion for summary judgment and for an adjustment in the

briefing schedule is DENIED; it is further

**ORDERED** that the Defendants shall file their cross-motion for summary judgment on

or before May 28, 2012.  Plaintiffs' Opposition/Reply shall be filed on or before June 14, 2012.

Defendants' Reply shall be filed on or before June 28, 2012.  Plaintiffs shall file the Joint

Appendix, pursuant to Local Civil Rule 7(n), by July 5, 2012.  The Court will schedule oral

argument on the motions if need be, pursuant to the parties' request, *see* Joint Stipulation, ECF

No. 10, at 4.

**SO ORDERED.**

**Date:** May 9, 2012

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge